IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. |
| ) | 04-00040-02-CR-W-NKL |
| TIMOTHY A. KATEUSZ, ) | |
| ) | |
| Defendant. ) | |

<u>REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE</u>

Before the court is defendant's motion to suppress his statement given on June 4, 2002, on the grounds that defendant's confession was not voluntary and was procured after defendant invoked his right to counsel. I conclude that defendant's statement was voluntary and that he did not invoke his right to counsel. Therefore, defendant's motion should be denied.

## I.  BACKGROUND

On June 3, 2002, defendant was arrested. The following day he was interviewed, he provided a signed statement, and he was released. On February 25, 2004, an indictment was returned charging defendant with conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. § 846, attempting to manufacture methamphetamine, in violation of 21 U.S.C. § 846, and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B). On September 27, 2004, defendant was arrested and was presented before me for his first appearance the following day. A detention hearing was held on September 30, 2004, and defendant was detained without bond.

On March 31, 2005, defendant appeared before me for a change-of-plea hearing; however, he reconsidered and did not enter a guilty plea. Nearly two months later, on

May 23, 2005, defendant filed a motion for leave to file a motion to suppress out of time. That motion was granted, and a hearing was held on June 2, 2005. Defendant appeared in person, represented by John J. Osgood and John R. Osgood. The government was represented by Assistant United States Attorney David DeTar Newbert. The evidence adduced at the hearing consisted of six exhibits and the testimony of four witnesses.

The witnesses were:

1. Defendant Timothy Kateusz

2. Detective Scott Ford

3. Detective Michael Hosack

4. Detective Chad Durbin

The exhibits were:

D. Ex. 1   Incident Report from Metro Drug Squad, Detective Ford

D. Ex. 2   Warning of Rights form

D. Ex. 3   Kansas City, Missouri, Police Department Report

D. Ex. 4   Defendant's statement

P. Ex. 5   Booking sheets for Donny Swank, defendant Timothy Kateusz, Ellen Nicole Wagner, and Rodney Lane

P. Ex. 6   Enlarged picture of defendant from his booking sheet

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. On June 3, 2002, Detective Scott Ford and Detective Michael Hosack were conducting surveillance of two homes at 6524 Richmond and 6601 Richmond (Tr. at 61, 86). They observed defendant, wearing an orange shirt and blue jeans, walking

2

back and forth between the two residences (Tr. at 61, 86). There was an outstanding felony warrant for defendant's arrest (Tr. at 61).

  2. Detective Ford and Detective Durbin went to the residence at 6601 Richmond while Detective Hosack went to the residence at 6524 Richmond (Tr. at 62, 86). Defendant ran out the back door of the residence and fled into the woods (Tr. at 62). Another individual ran out the back, and Detective Hosack stopped him (Tr. at 86). That individual was co-defendant Rodney Lane (Tr. at 86). Lane told Detective Hosack that defendant had run into the woods (Tr. at 87).

  3. Detectives Hosack and Ford ran after defendant (Tr. at 62, 87). Detective Hosack located defendant under some bushes about a quarter to a half a mile into the woods (Tr. at 87). Detective Hosack noticed that defendant was sweaty and was scratched up a bit from running through the woods (Tr. at 87). Detective Hosack also noticed that defendant had a strong chemical odor on him, indicating to the detective that defendant had been around chemicals used in a methamphetamine lab (Tr. at 88). Defendant was handcuffed and escorted out of the woods (Tr. at 62).

  4. Detective Ford is aware that the chemicals involved in clandestine labs are hazardous and can explode (Tr. at 62-63, 72). Detective Ford asked defendant if he would talk to the detective, and defendant said he would but did not want to talk in front of the other suspects (Tr. at 63). Therefore, the uniformed officers transported defendant to the StarMart on 63rd and 435, and Detective Ford followed them there (Tr. at 63). Detective Durbin remained at the residence gathering information for a search warrant (Tr. at 103).

  5. At the StarMart, Detective Ford advised defendant of his Miranda rights and interviewed him in the parking lot (Tr. at 63-64). The only other officer present was the uniformed officer who was the wagon driver (Tr. at 64). Detective Ford was

3

concerned about the presence of a meth lab in the residential area, so he asked defendant about it (Tr. at 64, 72). Defendant said there was no lab in the house at the time (Tr. at 64). Defendant talked about what was involved in making methamphetamine, but he did not say anything about his own involvement (Tr. at 65).

      6.     During the interview with defendant, Detective Ford received a phone call from Detective Durbin (Tr. at 65). Detective Durbin stated that based on what he had observed at the residence, he did not need anything from defendant and he was going to his office to type up the affidavit and apply for a search warrant (Tr. at 65, 103). Therefore, Detective Ford ended the interview with defendant (Tr. at 65). Detective Ford was not involved in interviewing defendant any further that day or the next (Tr. at 66, 67).

      7.     Detective Ford did not make any promises of leniency to defendant, and indeed does not have the authority to offer leniency (Tr. at 66). Detective Ford told defendant that if he cooperated, Detective Ford would let the prosecutor know that defendant cooperated (Tr. at 67). Detective Ford did not promise defendant he would not be charged (Tr. at 67).

      8.     Once the search warrant was obtained and executed, police discovered a methamphetamine lab inside the residence (Tr. at 88, 103).

      9.     The following day, on June 4, 2002, Detectives Hosack and Durbin interviewed defendant (Tr. at 88). Detective Ford was not present (Tr. at 88, 93, 95, 104). Detective Hosack asked defendant if he could read and write, then the detective read over the <u>Miranda</u> rights to defendant (Tr. at 89). He then let defendant read over the <u>Miranda</u> waiver form himself, and defendant signed the form (Tr. at 90). At the time, defendant appeared to be nervous, but his demeanor was not out of the ordinary (Tr. at 90). Detective Hosack has been around people high on methamphetamine many,

4

many times (Tr. at 91). Those people normally have a hard time keeping their train of thought and they do not focus very well (Tr. at 91). Defendant displayed no signs of being under the influence of methamphetamine (Tr. at 92). He provided a very detailed statement, did not forget things, did not repeat things, his eyes were clear, and he gave no indication of being under the influence of drugs or alcohol (Tr. at 92).

10. Detective Durbin asked most of the questions during the interview which lasted less than an hour (Tr. at 92, 108). A handwritten statement was prepared as a result of the interview, and defendant reviewed that statement and signed it (Tr. at 92-93, 97, 108; D. Ex. 4). Defendant signed the statement "of his own free will" (Tr. at 98). No one talked about a bond during that interview (Tr. at 100). At no time during the interview did defendant ask to see an attorney (Tr. at 93, 94, 95, 110, 116, 117). If any suspect requests an attorney during an interview, the interview is stopped immediately (Tr. at 94). There is no advantage to continuing the interview after that point because whatever is said could not be used (Tr. at 94). Neither Detective Hosack nor Detective Durbin made any promises of leniency to defendant during the interview (Tr. at 95, 117).

11. At no time during the interview was defendant promised leniency (Tr. at 109). At no time during the interview was defendant threatened (Tr. at 109).

12. During defendant's interview, defendant implicated co-defendant Donald Swank, defendant's girl friend and co-defendant Nicole Wagner, someone named Josh, and some girls at the corner of 65th Street (Tr. at 96-97). Defendant downplayed his own involvement, stating only that he "helped" (Tr. at 97, 109). Through subsequent investigation, Detective Hosack learned that defendant has been a major methamphetamine cook for a number of years (Tr. at 97).

During the hearing, defendant testified. Following is his version of the relevant events:

5

1. Defendant, 34 years of age, completed his third year of college in 1992 but did not finish (Tr. at 7). When he was 12 or 13, he began experimenting with drugs and eventually began using methamphetamine when he was 22 (Tr. at 8). At the time of defendant's arrest, he was consuming an average of a couple of grams of methamphetamine per week, by snorting, eating, smoking, and using it intravenously (Tr. at 8).

2. Defendant has a six-year-old son who lives with his mother (Tr. at 29). Defendant has semi-frequent contact with his son (Tr. at 30). Defendant's own mother lives in Alaska (Tr. at 30). Back in 1980, defendant's mother started the Missing Children of America Foundation (Tr. at 30). This was after defendant, age nine at the time, and his sisters were taken from his mother and spent three and a half years in Australia (Tr. at 30).

3. In January 2002, police came rushing up to defendant's Jeep with their guns drawn and arrested him (Tr. at 9). Defendant had methamphetamine in his possession at the time (Tr. at 9). He was questioned at the police station by Detective Hosack, was told he was in the wrong place at the wrong time, and was released the following day (Tr. at 9, 10).

4. About a month later, on February 22, 2002, defendant was pulled over in Liberty, Missouri, for having no taillights (Tr. at 10, 11). He pulled over at a gas station, and told the officer he had no driver's license (Tr. at 10-11). The officer asked defendant if he had anything on him, and defendant turned over his methamphetamine (Tr. at 11). Defendant was booked and was released the next day (Tr. at 11).

5. On March 20, 2002, defendant was arrested while working at a Liberty swimming pool (Tr. at 11). The officers had a warrant for his arrest for the February 22 incident (Tr. at 11). Bond was set at $20,000 (Tr. at 11). Later defendant's bond was

6

reduced and he was released on a personal recognizance bond on April 1 or 2 (Tr. at 12, 13). Defendant's next court date was set for May 3 or May 6; however, he did not show up (Tr. at 13). Defendant was using methamphetamine daily, and he was afraid to go to court in Clay County because he had missed a court date in Independence for a paraphernalia charge and he was afraid he would be arrested for that if he showed up at the Clay County court (Tr. at 13-14).

6. During one of these arrests, defendant asked the police to take him to see his son before he was taken to jail (Tr. at 31). The officers did not take him to see his son (Tr. at 31).

7. On June 3, 2002, defendant was at a residence owned by Brian Merrick at 65th and Richmond (Tr. at 14). Co-defendant Donny Swank was renting a room, and defendant and his girl friend, co-defendant Ellen Nicole Wagner, were "kind of sleeping on the couch." (Tr. at 14). On that day, defendant had taken a half to three quarters of a gram of methamphetamine by way of a capsule (Tr. at 15-16). Normally consuming that much methamphetamine would result in defendant's staying high for 24 to 36 hours (Tr. at 16). He is not able to engage in rational thought patterns and make sound judgments when he is high (Tr. at 17).

8. The front window blinds were open and defendant saw three or four police cars pull up (Tr. at 14). Defendant panicked, took off out the back door, and ran (Tr. at 14-15). Defendant ran as fast as he could into a wooded area behind the house (Tr. at 15). Defendant ran under a bush and was lying under the bush breathing heavily and heard a helicopter flying around above him (Tr. at 15). Defendant then saw three police officers with their badges around their necks (Tr. at 15). Detective Hosack saw defendant and said, "Do you know me?" (Tr. at 17). Defendant nodded (Tr. at 17). Detective Ford said, "You're not going to try to run on us, are you?" (Tr. at 18).

Defendant said no. The officers told him to come out, and he did (Tr. at 18). They walked him to the back of the back yard (Tr. at 18).

9. Defendant was not advised of his <u>Miranda</u> rights at this time (Tr. at 18). Defendant saw the others sitting close to the house in handcuffs (Tr. at 19). Defendant was breathing very heavily and he was very thirsty (Tr. at 19). Defendant was concerned about talking to the police in front of the others (Tr. at 19). Detective Ford asked defendant if he wanted to help himself out, "[k]ind of badgered [defendant] at that point." (Tr. at 19). Defendant felt overwhelmed and asked to get a drink (Tr. at 19). Defendant, handcuffed with his hands behind his back, was taken to a police car and driven to a nearby Conoco gas station (Tr. at 20). Defendant was taken there in a marked car and Detective Ford drove his car to the Conoco station (Tr. at 20). While in the car with the uniformed officer, defendant asked what his bond was, the officer said it was $40,000, defendant asked if that was high, and the officer said, "Yes." (Tr. at 21). That was the extent of the conversation while defendant was in the police car (Tr. at 21).

10. At the Conoco station, Detective Durbin went in and bought defendant a Mountain Dew (Tr. at 21). Defendant's cuffs were adjusted so that his hands were in front of him, and Detective Ford said he wanted to talk to defendant (Tr. at 21). Defendant and Detective Ford got into Detective Ford's Mustang (Tr. at 21). Detective Ford did not advise defendant of his <u>Miranda</u> rights and did not take the handcuffs off (Tr. at 22).

11. Detective Ford told defendant that it was Donny Swank the police were after, not defendant (Tr. at 23). At that point, defendant was providing no information (Tr. at 23). Detective Ford said if defendant wanted to help himself out, he could provide information on methamphetamine labs (Tr. at 22-23). Detective Ford gave defendant his private phone number (Tr. at 23).

8

12. At this time, defendant believed that the worst case scenario would involve him going to jail for a few weeks and then being released on bond again (Tr. at 23). After reviewing Detective Ford's report, defendant stated that he remembered providing Detective Ford with some information, i.e., that there was no lab in the residence because they did not have any money until Donny Swank got his disability check (Tr. at 24). Defendant also provided information about individuals who have helped Swank cook methamphetamine (D. Ex. 1). Defendant provided no inculpatory information during this interview (Tr. at 43; D. Ex. 1). Defendant was not advised of his <u>Miranda</u> rights prior to this interview (Tr. at 24).

13. After the interview, a uniformed officer took defendant to police headquarters (Tr. at 24). He was given a paper shirt and taken to the city jail where he spent the night (Tr. at 25). Defendant was anxious about not seeing his son (Tr. at 31). Even though he had not requested to see his son because he knew the police would not take him there, he felt anxious about not seeing his son because defendant was arrested on his son's birthday (Tr. at 31).

14. The next day, on June 4, 2002, at approximately 11:00 a.m., an officer took defendant from his cell to an interview room (Tr. at 26-27). The room was about ten feet by 12 feet and was furnished with a square table and three or four chairs (Tr. at 27). Defendant was not handcuffed (Tr. at 27). Detective Ford, Detective Hosack and Detective Durbin were there, and Detective Ford was there "the whole time." (Tr. at 27). According to defendant, Detective Ford did 99% of the talking during this interview (Tr. at 48, 121). Defendant was advised of his <u>Miranda</u> rights at that time and he signed a waiver of rights form (Tr. at 27; D. Ex. 2). Defendant understood the form at the time (Tr. at 28).

9

15. About five minutes after questioning began, when the detectives asked defendant what exactly was in the house, defendant said that maybe he should see a lawyer (Tr. at 29, 31). Detective Ford looked at Detective Durbin and said to defendant, "What good can a lawyer do for you right now?" (Tr. at 32). The detectives told defendant they were the ones who got him out on the recognizance bond back in April (Tr. at 32). Detective Ford asked defendant how much methamphetamine he thought he had during his arrests in January and in March (Tr. at 32). Detective Ford asked if maybe it was a teener, which is about a sixteenth of an ounce (Tr. at 32-33). He told defendant that he could be brought up on charges for those old arrests if he did not cooperate (Tr. at 33).

16. Defendant read the Report of Interview (D. Ex. 3) and testified that it was accurate except that it did not reflect that defendant had requested a lawyer (Tr. at 34). Defendant believed that Detective Durbin was preparing a question and answer statement while Detective Ford questioned defendant (Tr. at 34). Defendant signed the question/answer statement (Tr. at 35). However, before he signed it, he started to cry because he has "seen paperwork like that with a former friend of mine who was doing years in the penitentiary." Defendant said he would like to talk to a lawyer (Tr. at 37, 48). Detective Ford said that he could either sign it or not sign it, but either way it would not matter, nothing would come from this case (Tr. at 37, 48). Detective Ford told defendant that he had the authority to make things disappear or to bring things up if defendant did not cooperate (Tr. at 59). Defendant signed the form without reading it because the detectives said the case was not going to go anywhere anyway, but that it would be better for him if he did sign it (Tr. at 49, 57).

I find that defendant's testimony, for the most part, is not credible due to defendant's previous false statements, his own conflicting statements, and the inconsistencies with other credible evidence in the record. For example:

1. Defendant testified that he began using marijuana when he was 12 or 13, but he told Pretrial Services when he first appeared in this court on the federal charges that he began using marijuana when he was 15.

2. Even though defendant told police on June 3, 2002, that there was no lab in the house because they were waiting for Swank's disability check, defendant knew that there was indeed a lab in the house (Tr. at 39, 45, 58). He testified that he was telling the police "anything to try to get us out of trouble." (Tr. at 58).

3. Defendant testified that he told police he had not used methamphetamine in three to four days, but that statement was not true, he was just telling the police what he thought they wanted to hear so that he could get himself out of trouble (Tr. at 50). It is not plausible that defendant would think the police "wanted to hear" that he had not used methamphetamine in three days but would be unhappy to hear that defendant had used methamphetamine the day before.

4. Defendant testified that his girl friend, co-defendant Nicole Wagner, was not helping with the cooks (Tr. at 40). When asked whether she was cutting up match heads, defendant said, "She may have been. I don't know about all that." (Tr. at 40). This was despite defendant's admission that he and Nicole were living together in the same room at the time (Tr. at 40-41).

5. Defendant testified on direct examination that he did not want to talk at the house because he did not want to talk in front of the other people who had been arrested (Tr. at 19, 42). He then testified during cross examination that the reason he did not talk at the house was because he refused to talk until he had quenched his thirst

11

(Tr. at 41, 42). He subsequently agreed that part of the reason why he did not want to talk at the house was because he did not want to talk in front of the others (Tr. at 42).

6. Defendant testified that he was not aware that Donald Swank implicated defendant in methamphetamine cooks (Tr. at 54). However, defendant testified that he "glanced at" Swank's statement, and defense counsel stated that defendant had been made aware of what people are going to say about him at trial (Tr. at 55).

7. Defendant testified that he was extremely high on methamphetamine during his June 4 interview; however, he also testified that he was NOT so high that he was unable to recognize the detectives present and that he is certain Detective Ford was present and did 99% of the questioning (Tr. at 121-122).

8. Defendant testified that when he was arrested on June 3, 2002, he was hyperventilating, sweating, and delirious (Tr. at 42). He testified that he had consumed methamphetamine that very day and was "very intoxicated" (Tr. at 15-16, 44-45, 47). Yet, he told police on June 4 that he had last used methamphetamine three to four nights ago (D. Ex. 4, p. 3, 113). Detective Ford observed on June 3 that defendant was winded from running and was sweating when he was arrested (Tr. at 68). Defendant did not appear to Detective Ford to be intoxicated or under the influence of methamphetamine, defendant appeared to understand questions and answered coherently (Tr. at 68-70). Detective Ford observed that defendant was cooperative and was not hyper or fidgety (Tr. at 80). Although Detective Ford asked defendant questions about his own involvement, defendant would never give any responses to those questions and instead provided only information about involvement by others (Tr. at 70-71). Detective Durbin testified that defendant exhibited no signs of being under the influence of methamphetamine when he was interviewed on June 4 (Tr. at 107-108, 114-115). Defendant was interviewed 17 to 19 hours after he was arrested (Tr. at 115).

12

9. Defendant testified that Detective Durbin brought him a Mountain Dew when they were at the Conoco station on June 2, 2002 (Tr. at 21, 43-44). Detective Ford testified that the uniformed officer brought defendant a drink, and that Detective Durbin was not at the gas station (Tr. at 69). Detective Durbin telephoned Detective Ford while Detective Ford was at the gas station with defendant, so he could not have been present (Tr. at 69, 71). Detective Durbin testified that he was not at the gas station, rather he remained at the residence gathering information to apply for a search warrant (Tr. at 103).

10. Defendant testified that Detective Ford did 99% of the questioning and was at the interview "the whole time" on June 4, 2002 (Tr. at 27, 48). However, Detective Ford testified that he was not present at all during the June 4, 2002, interview (Tr. at 83). Detective Hosack testified that the only officers present during the June 4, 2002, interview were himself and Detective Durbin and that Detective Ford was not present that day (Tr. at 88, 89, 93). Detective Durbin testified that Detective Ford was not present that day (Tr. at 104, 108). Detective Durbin testified that he asked most of the questions during the interview and wrote down the answers (Tr. at 108).

## III. DEFENDANT'S STATEMENT

### A. *Miranda* Waiver

The government bears the burden of proving by a preponderance of the evidence that defendant made a knowing and voluntary waiver of his Miranda rights. Colorado v. Connelly, 479 U.S. 157, 158 (1986); United States v. Dougherty, 810 F.2d 763, 772 (8th Cir. 1987). There is no requirement that, to be voluntary, the waiver be the product of a free will. Connelly, 479 U.S. at 170. The sole concern of the Fifth Amendment, upon which Miranda was based, is governmental coercion. Id.; United States v. Washington, 431 U.S. 181, 187 (1977). The voluntariness of a waiver of this privilege depends on the

13

absence of police overreaching, i.e., the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Connelly, 479 U.S. at 170; Moran v. Burbine, 475 U.S. 412, 420 (1986); Fare v. C., 442 U.S. 707, 726-27 (1979).

An explicit statement of waiver is not invariably necessary to support a finding that the defendant waived his Miranda rights. North Carolina v. Butler, 441 U.S. 369 (1979). An express written or oral statement of waiver of Miranda rights is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. Id. at 373.

> The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived his rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That doesn't mean that the defendant's silence, coupled with an understanding of his rights and course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. . . . [I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.

Id. at 373.

Whether a defendant waived his Miranda rights is a question of fact for the trial judge and must be determined on the particular facts and circumstances surrounding the case, including the background, experience and conduct of the accused. Id. at 374; United States v. Dougherty, 810 F.2d 763, 772 (8th Cir. 1987); Stumes v. Solem, 752 F.2d 317, 319 (8th Cir. 1985). The totality of the circumstances test applies. Dougherty, 810 F.2d at 773.

Turning to the facts of this case, it is clear that defendant was advised of his Miranda rights on several occasions, and that he understood those rights. In fact, during the suppression hearing, defendant admitted that he signed the Miranda waiver form and that he understood those rights. Defendant does not allege that he was coerced into

14

initially waiving his Miranda rights, and I find that the evidence establishes that defendant voluntarily waived those rights, both on June 3, 2002, with Detective Ford at the gas station and on June 4, 2002, at the police station when he executed the Miranda waiver form.

### B. *Voluntariness of Statements*

In determining whether a confession is voluntary, a court should examine the circumstances surrounding the statement, including the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess. United States v. Mendoza, 85 F.3d 1347, 1350 (8th Cir. 1996); United States v. Johnson, 47 F.3d 272, 275-76 (8th Cir. 1995). Coercive government activity is necessary to prove that a statement was not voluntary. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986); United States v. Hatten, 68 F.3d 257, 262 (8th Cir. 1995, cert. denied, 516 U.S. 1150 (1996). However, misrepresentations on the part of the government do not make a statement per se involuntary. United States v. Petary, 857 F.2d 458, 461 (8th Cir. 1988); Flittie v. Solem, 775 F.2d 933, 945 (8th Cir. 1985) (en banc), cert. denied, 475 U.S. 1025 (1986). It is only one factor to be considered in reviewing the totality of the circumstances. Frazier v. Cupp, 394 U.S. 731, 739 (1969); United States v. Petary, 857 F.2d at 461. See also United States v. Mendoza, 85 F.3d at 1350 (statement voluntary even though defendant was told that the only alternative to cooperating with the police was immediate arrest); United States v. Harris, 914 F.2d 927, 933 (7th Cir. 1990) (police may solicit confession by offering to reduce charges against defendant).

In this case, there was no credible evidence to support defendant's contention that his statements were involuntary. There is no evidence that defendant's statements were the result of coercion, duress, threats, tricks, promises, or false pretenses. Because

15

there is no credible evidence of coercive governmental activity, defendant's motion to suppress on the ground that his statements were involuntary should be denied.

### C. *Request for an Attorney*

Finally, defendant argues that his requests for an attorney during the June 4, 2002, interrogation were ignored by police and the questioning continued despite his requests.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." In Michigan v. Jackson, 475 U.S. 625 (1986), the Supreme Court held that once this right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective. See also McNeil v. Wisconsin, 501 U.S. 171, 175 (1991).

Here, there is no plausible evidence that defendant ever requested an attorney during his June 4 interrogation. Defendant's testimony is not credible for the reasons outlined above. Because there is no evidence that defendant requested an attorney, that his requests were ignored, and that his statement was secured after his requests for an attorney were ignored, defendant's motion to suppress on this basis should be denied.

## IV. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in section III, I find that defendant was advised of his Miranda rights prior to each statement on June 3 and June 4, 2002; that defendant voluntarily waived his Miranda rights; that his statements were voluntary; and that there is no credible evidence that he invoked his right to counsel.

Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress

16

statements.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of receipt of a copy of this report and recommendation to file and serve specific objections.

        /s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 14, 2005